TODD BLANCHE
Deputy Attorney General
BILAL ESSAYLI
First Assistant United States Attorney
IAN V. YANNIELLO
Assistant United States Attorney
Chief, National Security Division
JOHN J. LULEJIAN (Cal. Bar No. 186783)
Assistant United States Attorney
     1200 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone:  (213) 894-0721
     Facsimile:  (213) 894-0141
     E-mail:     John.Lulejian@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF<br><br>MEDHAT MOURID,<br><br>A Fugitive from the Government of the Federal Republic of Germany. | No. 2:26-cv-02074-SB-MAA<br><br>UNITED STATES' OPPOSITION TO RELATOR'S MOTION TO REVOKE MAGISTRATE JUDGE'S DETENTION ORDER; DECLARATION OF JOHN J. LULEJIAN; EXHIBIT<br><br>Hearing Date: April 6, 2026<br>Hearing Time: 11:00 a.m.<br>Location:    Courtroom of the Honorable Stephen V. Wilson |

Plaintiff United States of America, by and through its counsel of record, the Deputy Attorney General, the First Assistant United States Attorney for the Central District of California, and Assistant United States Attorney John J. Lulejian hereby files its Opposition to Relator's Motion to Revoke Magistrate Judge's Detention Order (Docket No. 42).  This response is based on the attached Memorandum of Points and Authorities, the United States' Request for Detention (Docket No. 14), the United States' Reply in Support of

Detention (Docket No. 13), the United States' Supplemental Reply in Support of Detention (Docket No. 21), the statements made by counsel for the United States at the December 12, 2025 (Docket No. 28 (transcript of 12/12/2025 hearing)), and any evidence that may be presented at a further hearing on this matter.

For the reasons set forth in detail below, the United States respectfully requests the Court deny Relator MEDHAT MOURID's application and continue to detain him pending extradition to Germany.

Dated: March 9, 2026                    Respectfully submitted,

                                        TODD BLANCHE
                                        Deputy Attorney General

                                        BILAL A. ESSAYLI
                                        First Assistant U.S. Attorney

                                        IAN V. YANNIELLO
                                        Assistant United States Attorney
                                        Chief, National Security Division


                                        */s/ John J. Lulejian*
                                        JOHN J. LULEJIAN
                                        Assistant United States Attorney

                                        Attorney for Plaintiff
                                        UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                                    PAGE

TABLE OF AUTHORITIES............................................ii

MEMORANDUM OF POINTS AND AUTHORITIES..............................1

I.    INTRODUCTION................................................1

II.   ARGUMENT....................................................2

      A.    Legal Standard........................................2

      B.    MOURID Cannot Overcome the Strong Presumption Against
            Bail..................................................3

            1.    The Court Should Require MOURID to Establish
                  "Special Circumstances".........................3

            2.    MOURID Continues to Fail to Establish "Special
                  Circumstances" that Warrant Release on Bail......4

                  a.    MOURID's Health is not a "Special
                        Circumstance".............................5

            3.    The Purported Delay in the Extradition and Arrest
                  of MOURID Is Not a "Special Circumstance".........8

                  a.    The Possibility of Protracted Extradition
                        Proceedings is Not a "Special Circumstance"....13

                  b.    The Status of Other Fugitives Is Not a
                        "Special Circumstance"......................16

                  c.    Family Hardships are not "Special
                        Circumstances"............................16

            4.    MOURID Continues to be a Flight Risk.............19

III.  CONCLUSION.................................................20

**TABLE OF AUTHORITIES**

<u>DESCRIPTION</u>                                                                <u>PAGE</u>

<u>FEDERAL CASES</u>

<u>Barapind v. Enomoto</u>,
    400 F.3d 744 (9th Cir. 2005) (en banc)....................... 15

<u>In re Extradition of Antonowicz</u>,
    244 F. Supp. 3d 1066 (C.D. Cal. 2017)................ 2, 14, 17

<u>In re Extradition of Azizi</u>,
    No. 5:14-xr-90282, 2015 WL 1299791
    (N.D. Cal. Mar. 20, 2015).................................... 15

<u>In re Extradition of Beresford-Redman</u>,
    753 F. Supp. 2d 1078 (C.D. Cal. 2010)....................... 17

<u>In re Extradition of Budrys</u>,
    No. 19 M 179, 2019 WL 1958566
    (N.D. Ill. May 2, 2019)............................ 9, 13, 18

<u>In re Extradition of Carr</u>,
    No. 20 CR 370, 2020 WL 4816052
    (N.D. Ill. Aug. 18, 2020).............................. 9, 14

<u>In re Extradition of Drayer</u>,
    190 F.3d 410 (6th Cir. 1999)................................. 8

<u>In re Extradition of Drumm</u>,
    150 F. Supp. 3d 92 (D. Mass. 2015).......................... 17

<u>In re Extradition of Garcia</u>,
    761 F. Supp. 2d 468 (S.D. Tex. 2010)........................ 4

<u>In re Extradition of Gohir</u>,
    No. 2:14-MJ-00314-CWH, 2014 WL 2123402
    (D. Nev. May 21, 2014)....................................... 5

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                          PAGE

In re Extradition of Hamilton-Byrne,
    831 F. Supp. 287 (S.D.N.Y. 1993)............................. 6

In re Extradition of Heilbronn,
    773 F. Supp. 1576 (W.D. Mich. 1991)........................ 13

In re Extradition of Huerta,
    No. H-08-342M, 2008 WL 2557514
    (S.D. Tex. June 23, 2008)................................... 5

In re Extradition of Kin-Hong,
    913 F. Supp. 50 (D. Mass. 1996)............................. 3

In re Extradition of Kirby,
    106 F.3d 855 (9th Cir. 1996)............................... 13

In re Extradition of Kraiselburd,
    786 F.2d 1395 (9th Cir. 1986).............................. 9

In re Extradition of Kyung Joon Kim,
    No. CV 04-3886-ABC(PLA), 2004 WL 5782517
    (C.D. Cal. July 1, 2004)................................... 5

In re Extradition of Mahabir,
    858 F. Supp. 504 (D. Md. 1994)............................ 17

In re Extradition of Mainero,
    950 F. Supp. 290 (S.D. Cal. 1996)....................... 3, 13

In re Extradition of Martinelli Berrocal,
    263 F. Supp. 3d 1280 (S.D. Fla. 2017).................... 14

In re Extradition of Nacif-Borge,
    829 F. Supp. 1210 (D. Nev. 1993)........................ 2, 5

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                    PAGE

In re Extradition of Perez-Cueva,
    No. 2:16-mj-00233, 2016 WL 884877
    (C.D. Cal. Mar. 7, 2016) ...................................... 3

In re Extradition of Rouvier,
    839 F. Supp. 537 (N.D. Ill. 1993) ............................ 5

In re Extradition of Santos,
    473 F. Supp. 2d 1030 (C.D. Cal. 2006) ....................... 16

In re Extradition of Schumann,
    No. 18 CR 283, 2018 WL 4777562
    (N.D. Ill. Oct. 3, 2018) ..................................... 17

In re Extradition of Siegmund,
    887 F. Supp. 1383 (D. Nev. 1995) ............................. 3

In re Extradition of Smyth,
    976 F.2d 1535 (9th Cir. 1992) ........................... _passim_

In re Extradition of Tehrani,
    No. SA 16-MJ-250-RAO, 2016 WL 3456971
    (C.D. Cal. June 17, 2016) ................................... 14

In re Mitchell,
    171 F. 289 (S.D.N.Y. 1909) ................................... 2

Kamrin v. United States,
    725 F.2d 1225 (9th Cir. 1984) ............................ 9, 12

Mainero v. Gregg,
    164 F.3d 1199, 1207 (9th Cir. 1999) ......................... 14

Man-Seok Choe v. Torres,
    525 F.3d 733 (9th Cir. 2008) ................................ 12

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                      PAGE

Martin v. Warden, Atlanta Pen.,

    993 F.2d 824 (11th Cir. 1993)........................... 8, 12

Martinez v. United States,

    828 F.3d 451 (6th Cir. 2016) (en banc)...................... 9

Martinez Santoyo v. Boyden,

    130 F.4th 784 (9th Cir. 2025)................................ 9

Rana v. Jenkins,

    113 F.4th 1058 (9th Cir. 2024)............................. 15

Salerno v. United States,

    878 F.2d 317 (9th Cir. 1989)........................... 2, 13

United States ex rel. McNamara v. Henkel,

    46 F.2d 84 (S.D.N.Y. 1912)................................. 13

United States v. Kin-Hong,

    83 F.3d 523 (1st Cir. 1996)........................... 13, 14

United States v. Leitner,

    784 F.2d 159 (2d Cir. 1986)................................. 2

United States v. Nolan,

    No. 08-M-97, 2009 WL 4544699

    (N.D. Ill. Dec. 1, 2009).................................... 5

United States v. Risner,

    No. 3:18-MJ-765-BN, 2018 WL 6809796

    (N.D. Tex. Dec. 27, 2018)................................... 8

United States v. Snyder,

    No. 13-7082-mj, 2015 WL 1364275

    (D. Ariz. Apr. 3, 2013)..................................... 2

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                PAGE

United States v. Taitz,

    130 F.R.D. 442 (S.D. Cal. 1990)........................... 4, 6

Wright v. Henkel,

    190 U.S. 40 (1903)......................................... 2


U.S. STATUTES

18 U.S.C. § 3184............................................... 12

18 U.S.C. § 3184, et seq........................................ 8


TREATIES

Treaty Between the United States of America and the Federal

    Republic of Germany Concerning Extradition, U.S.-F.R.G.,

    June 20,1978, T.I.A.S. No. 9785, as amended by the

    Supplementary Extradition Treaty with the Federal Republic

    of Germany, U.S.-F.R.G., Oct. 21, 1986, S. Treaty Doc. No.

    100-6 (1987), as amended by the Second Supplementary Treaty

    to the Treaty Between the United States of America and the

    Federal Republic of Germany Concerning Extradition, U.S.-

    F.R.G., Apr. 18, 2006, S. Treaty Doc. No. 109-14 (2006).. passim

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.    INTRODUCTION**

3     The Court should uphold the January 20, 2026, decision of

4   Magistrate Judge Audero granting the United States' request to detain

5   MEDHAT MOURID ("MOURID") pending his ongoing extradition proceedings

6   (Docket No. 37).  MOURID is wanted by Germany so that he may be

7   prosecuted for his role in a large-scale fraud scheme in which MOURID

8   and his co-conspirators falsified subscriptions to online adult

9   entertainment services that were never provided, fraudulently charged

10  through German payment service providers the unsuspecting victims'

11  credit and debit cards, and distributed the wrongly charged money,

12  amounting to approximately € 300 million, to the participants in the

13  global criminal organization.

14     MOURID, a citizen of the United States, was arrested on

15  November 4, 2025, in connection with Germany's request.  Following

16  extensive briefing and a hearing, Magistrate Judge Audero ordered

17  MOURID detained for the duration of his extradition proceedings

18  because he failed to establish that "special circumstances" warranted

19  his release.

20     There have been no material changes since Magistrate Judge

21  Audero's January 20, 2026, decision, and MOURID remains unable to

22  carry his heavy burden of proving that "special circumstances"

23  warrant his release and that he is not an unacceptable flight risk.

24  Accordingly, as set forth below and as detailed in the United States'

25  previous filings (<u>see</u> Docket Nos. 1, 13, 14, 21), the Court should

26  deny MOURID's bail application and continue to detain him pending the

27  outcome of his extradition proceedings.

28

II.    **ARGUMENT**

   A.    **Legal Standard**[1]

      Unlike in domestic criminal cases, "[t]here is a presumption
against bail in an extradition case." Salerno v. United States, 878
F.2d 317, 317 (9th Cir. 1989); see also United States v. Snyder, No.
13-7082-mj, 2015 WL 1364275, at *2 (D. Ariz. Apr. 3, 2013) (noting
that presumption against bail in extradition is "well-established").
The Supreme Court established this presumption against bail in Wright
v. Henkel, explaining that, when a foreign government makes a proper
request under a valid extradition treaty, as is the case here, the
United States is obligated to deliver the fugitive after he or she is
apprehended. 190 U.S. 40, 62 (1903). The rationale behind this
presumption is to preserve important foreign relations policy
interests. See id.; In re Extradition of Nacif-Borge, 829 F. Supp.
1210, 1214 (D. Nev. 1993). Thus, a court may grant release on bond
in an extradition proceeding "only in the most pressing
circumstances, and when the requirements of justice are absolutely
peremptory." United States v. Leitner, 784 F.2d 159, 160 (2d Cir.
1986) (quoting In re Mitchell, 171 F. 289, 289 (S.D.N.Y. 1909)
(Hand, J.)).

      Considering the strong presumption against bail established in
Wright and its progeny, an international fugitive may not be released
on bail unless he demonstrates that (1) he is neither a flight risk
nor a danger to the community, and (2) "special circumstances"
warrant release. See, e.g., In re Extradition of Antonowicz, 244 F.

---

      [1] The United States set forth a more detailed discussion of the
legal standard for bail in extradition matters in its Request for
Detention, filed with this Court on November 7, 2025. (See Docket
No. 14.)

2

Supp. 3d 1066, 1068 (C.D. Cal. 2017); <u>In re Extradition of Maniero</u>, 950 F. Supp. 290, 294 (S.D. Cal. 1996). "This 'special circumstances' standard is much stricter than the 'reasonable assurance' of appearance standard made applicable to domestic criminal proceedings by the Bail Reform Act." Importantly, "[s]pecial circumstances must be extraordinary and not factors applicable to all defendants facing extradition." <u>Maniero</u>, 950 F. Supp. at 294 (citing <u>In re Extradition of Smyth</u>, 976 F.2d 1535, 1535-36 (9th Cir. 1992)); <u>In re Extradition of Kin-Hong</u>, 913 F. Supp. 50, 53 (D. Mass. 1996). The fugitive must satisfy all three criteria; it is not enough that he meet his burden on one or two of the required factors. <u>See</u>, <u>e.g.</u>, <u>In re Extradition of Perez-Cueva</u>, No. 2:16-mj-00233, 2016 WL 884877, at *2 (C.D. Cal. Mar. 7, 2016) ("special circumstances" must exist in addition to absence of risk of flight); <u>In re Extradition of Siegmund</u>, 887 F. Supp. 1383, 1387 (D. Nev. 1995) (same).

**B.  MOURID Cannot Overcome the Strong Presumption Against Bail**

As Magistrate Judge Audero correctly found, MOURID has failed to demonstrate that he is entitled to bail. He has not presented "special circumstances" that, considered alone or together, would justify release on bail, nor has he established that he is not a flight risk.

   1. <u>The Court Should Require MOURID to Establish "Special Circumstances"</u>

In a footnote to his brief, MOURID implies that he should not be required to establish "special circumstances" in his case because Germany does not extradite its own citizens to the United States.

(See Docket No. 42 at 9 n.4)  His assertion fails for multiple reasons.

First, MOURID cites to no source that permits the Court to lower or otherwise change the longstanding bail standard applicable in extradition cases.  Second, Germany's inability to extradite its own citizens to the United States does not relieve the United States of complying with its treaty obligations.  The treaty partners presumably discussed the differences between their laws during treaty negotiations and nonetheless agreed to sign an extradition treaty.  MOURID's status as a U.S. citizen is not a basis for changing the longstanding standard for bail in extradition cases nor is it a basis for the United States to dismiss its carefully negotiated agreement with Germany.

Accordingly, the United States respectfully requests that the Court require MOURID to establish "special circumstances" as a condition to be released on bail.  The negative consequences of a fugitive on bond fleeing "support requiring [a fugitive] to meet a heightened burden in a request for bail."  In re Extradition of Garcia, 761 F. Supp. 2d 468, 475 (S.D. Tex. 2010).  In other words, "[i]f the United States were to release a foreign fugitive pending extradition and the [fugitive] absconded, the resulting diplomatic embarrassment would have an effect on foreign relations and the ability of the United States to obtain extradition of its fugitives."  United States v. Taitz, 130 F.R.D. 442, 444 (S.D. Cal. 1990) (citation omitted).

      2.   MOURID Continues to Fail to Establish "Special Circumstances" that Warrant Release on Bail

In his motion for bail, MOURID lists several factors that he

claims constitute "special circumstances."  But as set forth below,
none of these factors, either individually or in the aggregate,
satisfies the stringent standard for permitting his release on bail.

          *a.   MOURID's Health is not a "Special Circumstance"*

As a general matter, courts are reluctant to find that health
conditions are "special circumstances" when they can be treated by
the incarceration facility.  See In re Extradition of Gohir, No.
2:14-MJ-00314-CWH, 2014 WL 2123402, at *12 (D. Nev. May 21, 2014)
("[The fugitive] has referenced on multiple occasions that he is
diabetic and will not be able to receive adequate treatment if
detained.  There is nothing indicating that the detention facility is
unable to meet [the fugitive's] medical needs.  Nor is there any
indication that his health has deteriorated or that he has been
unable to receive treatment during his detention."); see also
United States v. Nolan, No. 08-M-97, 2009 WL 4544699, at *3 (N.D.
Ill. Dec. 1, 2009) ("deterioration of [fugitive's] health" based on
placement in solitary confinement, while receiving treatment for skin
cancer, is not a special circumstance); In re Extradition of Huerta,
No. H-08-342M, 2008 WL 2557514, at *2 (S.D. Tex. June 23, 2008) (high
blood pressure, diabetes requiring daily medication and strict diet,
prostate problems, and anemia not "special circumstances"); In re
Extradition of Kyung Joon Kim, No. 04-cv-3886, 2004 WL 5782517, at *5
(C.D. Cal. July 1, 2004) (increasing back pain requiring daily anti-
inflammatory medication not "special circumstance"); Nacif-Borge, 829
F. Supp. at 1216-17 (need for specialized diet and exercise are not
"special circumstance"); In re Extradition of Rouvier, 839 F. Supp.
537, 541-42 (N.D. Ill. 1993) (heart condition requiring daily
medication not "special circumstance").

In fact, courts have refused to find "special circumstances" in cases involving fugitives with similar and even with more serious health concerns than those alleged by MOURID.  Only health conditions much more severe than MOURID alleges, which cannot be adequately managed by the detention facility, have been recognized as a "special circumstance."  See, e.g., United States v. Taitz, 130 F.R.D. 442, 446 (S.D. Cal. 1990) (allergic reactions to certain materials commonly found in jail, which caused numerous rashes and stomach ailments, were, in combination with other factors, a "special circumstance"); In re Extradition of Hamilton-Byrne, 831 F. Supp. 287, 290-91 (S.D.N.Y. 1993) (noting that "[s]pecial circumstances might . . . be found if a health emergency could be established which could only be treated while a detainee was on bail," and rejecting health claim as a special circumstance because "[n]othing convinces me that the [fugitives'] health problems are unique or cannot be dealt with while in custody").

In this case, MOURID alleges that because he suffers from high cholesterol, he must receive specific medications, exercise, and diet to manage this condition.  (See Docket No. 42 at 10-17.)  Although there were some issues with his initial treatment, the Bureau of Prisons is providing MOURID with two of the cholesterol medications he has specifically requested (Crestor and Zetia).  (See Docket Nos. 35 at 3-4; 37 at 26.)  MOURID acknowledges that the Bureau of Prisons offers its National High Rise Menu (Docket No. 35-1), but he claims he is entitled to bail because he cannot eat the foods he ate prior

to his incarceration.[2]  (See Docket No. 42 at 14.)  Setting aside the
fact that incarceration, by its nature, will not mimic an inmate's
lifestyle at home, it is telling that MOURID does not explain why he
cannot change his eating habits to accommodate the BOP menu and avoid
foods that may impact on his medical condition.  Likewise, even
though exercise options are available at MDC-LA, he seeks release
because he cannot exercise as he was used to doing before his
incarceration.[3]  (See id. at 15-16.)  While exercise may be more
difficult to do at MDC-LA, he is able exercise on the deck and in his
cell.  In the end, like his dietary choices, it is MOURID's
responsibility to find ways to increase his heart rate.

MOURID also complains that his health has deteriorated during
his incarceration.  While his Lp(a) level has increased since October
2025, the Bureau of Prisons cannot assess how this change impacts his
medical condition without additional information.  BOP also needs
additional information about MOURID's medical history, and MOURID
would need to meet with a cardiologist, before it could consider
prescribing Repatha, an additional medication MOURID has requested.
Of note, "[o]n December 16, 2025, MOURID's counsel wrote an e-mail to
MDC-LA in which he stated that they were coordinating with MOURID's
treating physician to transmit to MDC-LA MOURID's medical records and
information about his medical conditions."  (Docket No. 35 at 5.)
However, it was not until March 5, 2026, after MOURID filed the

---

[2] MOURID's states that prior to his incarceration, his diet
included "walnuts, avocados, salmon," "Greek yogurt, sunflower seeds,
chia seeds, and/or tofu with tomatoes", "lean chicken, vegetables
such as broccoli, brussels sprouts, and asparagus, steamed not
boiled."  (Docket No. 42 at 14.)

[3] MOURID states that "[b]efore he was incarcerated, he rode a
stationary bike (a Peloton) three days a week and he went to the gym
one or two days a week."  (Docket No. 42 at 15.)

1    instant motion, when he provided his medical records to the MDC-LA

2    medical staff.  (See Decl. of John J. Lulejian, dated 03/09/2026, at

3    ¶ 2, Ex. A.)  Prior to the upcoming hearing, the United States will

4    contact the MDC-LA medical staff to determine what steps they will

5    take to treat MOURID in light of these records, and it is anticipated

6    the United States will have more information about MOURID's medical

7    treatment at MDC-LA at the upcoming hearing on April 6, 2026.

8         3.    The Purported Delay in the Extradition and Arrest of

9               MOURID Is Not a "Special Circumstance"

10        Contrary to MOURID's claim (Docket No. 42 at 12-15), courts have

11   held that delays in requests for extradition do not create a "special

12   circumstance."  This is true even when the delay is several years, as

13   MOURID alleges here.  See, e.g., United States v. Risner, No. 3:18-

14   MJ-765-BN, 2018 WL 6809796, at *23 (N.D. Tex. Dec. 27, 2018) ("[T]he

15   Court is not persuaded that, even if the [20-year] delay reflects

16   that Colombia has not made [fugitive's] extradition to serve his

17   sentence a priority, this weighs heavily (or otherwise) in favor of

18   release."); In re Extradition of Drayer, 190 F.3d 410, 415 (6th Cir.

19   1999) (Canada's fourteen-year delay in seeking extradition did not

20   bar extradition); cf. Martin v. Warden, Atlanta Penitentiary, 993

21   F.2d 824, 828 (11th Cir. 1993) (Canada's seventeen-year delay did not

22   violate claimed due process right to speedy extradition).

23        Indeed, the extradition statute does not impose limits on the

24   time by which a country requesting extradition must present its

25   request to the United States.  See 18 U.S.C. § 3184 et seq.  The

26   Constitution, likewise, "does not of its own force impose on foreign

27   governments the obligation to act speedily in seeking extradition of

28   a fugitive from the United States."  In re Extradition of

                                        8

Kraiselburd, 786 F.2d 1395, 1398 (9th Cir. 1986); see Kamrin v.
United States, 725 F.2d 1225, 1227-28 (9th Cir. 1984); cf. Martinez
Santoyo v. Boyden, 130 F.4th 784 (9th Cir. 2025) (holding that
Mexican "extradition treaty's 'lapse of time' language does not
incorporate the Sixth Amendment Speedy Trial Clause"); Martinez v.
United States, 828 F.3d 451, 462 (6th Cir. 2016) (en banc) (same).

"Courts generally consider delay a factor where the extradition
hearing itself was significantly delayed or the defendant's liberty
interests were greatly affected." In re Extradition of Budrys, No.
19 M 179, 2019 WL 1958566, at *3 (N.D. Ill. May 2, 2019) (citing
cases). However, there is no reason to believe the extradition
proceedings will be significantly delayed. Indeed, the United States
is prepared to schedule and move forward with briefing and the
extradition hearing quickly. Moreover, as set forth further below,
any attempt by MOURID to delay proceedings for the purpose of
conducting his own investigation or turning this extradition
proceeding into a trial on the merits of Germany's claims would be
improper. MOURID also cannot show that his liberty interests were
affected because, as he admitted at his initial appearance, he has
been living freely in the United States. Thus, as in Budrys, "[a]ny
delay" in Germany's pursuit of extradition has "neither affected"
MOURID's "life here in the United States nor his ability to mount a
defense to the charges in" Germany. 2019 WL 1958566, at *3. The
purported delay is therefore not a "special circumstance" meriting
release. Id.; see also In re Extradition of Carr, No. 20 CR 370,
2020 WL 4816052, at *5 (N.D. Ill. Aug. 18, 2020) (by fugitive's "own
admission, he was living openly in Chicago for the past two and a
half years" and "[n]ow that he is in custody on the charge, the

9

1    proceedings are moving promptly").

2        MOURID's argument that Germany violated the extradition treaty

3    by providing supplements to its initial extradition request falls

4    flat.  As MOURID appears to admit (Docket No. 42 at 13-16), the U.S.-

5    Germany Extradition Treaty[4] allows for supplements to be provided to

6    extradition requests, as well as permits the requested state (the

7    United States in this case) to set deadlines for such supplements.

8    Accordingly, Germany's extradition request fully complied with the

9    terms of the Treaty.

10       As reflected in the Declaration from U.S. Department of State

11   Attorney Adviser Stacy Hauf (Docket No. 33-1), Germany initially

12   sought MOURID's extradition via diplomatic note on October 14, 2025.

13   The United States proceeded with MOURID's provisional arrest pursuant

14   to Article 16 of the Treaty on November 4, 2025, as part of a global

15   takedown coordinated by Germany.  MOURID is correct that, pursuant to

16   Article 16(4) of the Treaty, Germany's deadline for submitting its

17   extradition request to the United States was 40 days from MOURID's

18   November 4, 2025, arrest.  In a letter from the State Department to

19   the U.S. Department of Justice (Docket No. 33), the United States

20   requested that Germany provide additional information from Germany to

21   support its extradition request by January 2, 2026, which was 60 days

22   after the date of arrest.  As permitted by Article 15(1) of the

23

24   _____

25       [4] Treaty Between the United States of America and the Federal
     Republic of Germany Concerning Extradition, U.S.-F.R.G., June
26   20,1978, T.I.A.S. No. 9785, as amended by the Supplementary
     Extradition Treaty with the Federal Republic of Germany, U.S.-F.R.G.,
     Oct. 21, 1986, S. Treaty Doc. No. 100-6 (1987), as amended by the
27   Second Supplementary Treaty to the Treaty Between the United States
     of America and the Federal Republic of Germany Concerning
28   Extradition, U.S.-F.R.G., Apr. 18, 2006, S. Treaty Doc. No. 109-14
     (2006) (collectively, the "Treaty").

Treaty, Germany sought an additional two-week extension until January 16, 2026, which the United States granted.  Germany submitted its supplemental materials via diplomatic note on January 15, 2026. (Docket No. 43, Ex. A.)  Thus, the timing of submission of Germany's extradition request fully complied with the Treaty.[5]

Additionally, contrary to MOURID's claim (Docket No. 42 at 21), the fact that Germany sought an extension does not demonstrate lack of diplomatic urgency.  As MOURID acknowledges, this is a complex financial fraud case that is supported by numerous documents in Germany.  It is not unreasonable for Germany to have taken some additional time to condense its evidence into an extradition request that could more easily be digested by the respective parties and court in the United States.  In essence, MOURID is trying to have it both ways where Germany is faulted for taking time to present this complex case to the United States while he is forgiven for taking time to process the information from Germany.  (Docket No. 42 at 21-23.)  The Court should reject MOURID's argument and decline to find that Germany failed to act with sufficient diligence.

However, even if MOURID could show lack of diplomatic attention, which he cannot, any consideration of delay must be left to the discretion of the U.S. Secretary of State.  See Man-Seok Choe v. Torres, 525 F.3d 733, 741 (9th Cir. 2008) (concluding "[t]o the

---

[5] Of note, Germany's extradition request and corresponding supplement were transmitted by the diplomatic channel directly to the U.S. Department of State, as required by Article 14(1) of the Treaty. After the State Department concluded its review, it forwarded the extradition request, supplement, and declaration confirming that Germany properly submitted and authenticated its extradition materials to the Department of Justice for forwarding to defense counsel and the Court.

extent there was a delay, this is a matter left for the Secretary of State's consideration"); <u>Martin</u>, 993 F.2d at 830 (fugitive "should direct his argument that extradition is unjust in this case based on Canada's alleged lengthy delay in seeking extradition or on humanitarian grounds to the Executive Branch").  The judicial officer's role in extradition proceedings is merely to determine whether the "evidence" is "sufficient to sustain the charge" that is alleged by the foreign sovereign, according to "the provisions of the proper treaty."  18 U.S.C. § 3184.  Passing judgment on another country's investigative, judicial, or penal system clearly implicates foreign relations and is, therefore, properly reserved for the Secretary.  <u>See</u> <u>Martin</u>, 993 F.2d at 829 (discussing the rule of non-inquiry, which generally "precludes extradition magistrates from assessing the investigative, judicial, and penal systems of foreign nations when reviewing an extradition request"); <u>Kamrin</u>, 725 F.2d at 1227 ("When the United States is the requested country, delay in seeking extradition may be relevant to the Secretary of State's final determination as to whether extradition may go forward.  The delay may not, however, serve as a defense to judicial extradition proceedings.") (citation omitted).

Thus, MOURID's claim regarding delay is not a "special circumstance."  To the extent delay is relevant, the impact of Germany's alleged delay in MOURID's criminal proceedings in Germany or his extradition proceedings is reserved for the Secretary of State, to whom MOURID will have an opportunity to make a submission setting forth his arguments against extradition.

1                      *a.   The Possibility of Protracted Extradition*

2                      *Proceedings is Not a "Special Circumstance"*

3          MOURID also insists that, due to the complexity the case, there

4    will be significant delay in the extradition proceeding that amounts

5    to a "special circumstance." (See Docket No. 42 at 15-18.)  But he

6    identifies nothing so extraordinary as to overcome the presumption

7    against release.

8          The Ninth Circuit has recognized that "'unusual delay in the

9    appeal process' can be a 'special circumstance' that will justify

10   bail . . . ."  See In re Extradition of Kirby, 106 F.3d 855, 863 (9th

11   Cir. 1996) (quoting Salerno, 878 F.2d at 317).  However, the delay

12   must be something beyond what are simply "factors applicable to all

13   defendants facing extradition."  Maniero, 950 F. Supp. at 294; see

14   Smyth, 976 F.2d at 1535-36 ("The need to consult with counsel, gather

15   evidence and confer with witnesses, although important, is not

16   extraordinary; all incarcerated defendants need to do these

17   things.").  Significantly, the delay caused by or attributed to the

18   fugitive is not a "special circumstance."  See, e.g., United States

19   v. Kin-Hong, 83 F.3d 523, 525 (1st Cir. 1996) (rejecting bail claim

20   where "[t]o the extent that there has been some delay, [the

21   petitioner] himself is partly responsible"); In re Extradition of

22   Heilbronn, 773 F. Supp. 1576, 1581 (W.D. Mich. 1991) (court

23   unsympathetic to petitioner who requested several delays);

24   United States ex rel. McNamara v. Henkel, 46 F.2d 84 (S.D.N.Y. 1912)

25   (delay justifies bail "only where the hearing date comes and the

26   complainant is not ready to proceed").

27         Moreover, the "normal passage of time inherent in the litigation

28   process" does not constitute a special circumstance.  Budrys, 2019 WL

                                        13

1   1958566, at *3 (quoting <u>Kin-Hong</u>, 83 F.3d at 525).  Rather, for a

2   delay to constitute a "special circumstance," it must be "unusual or

3   excessive."  <u>Antonowicz</u>, 244 F. Supp. 3d at 1070.  Courts have

4   rejected the "potential for an extended delay" when it is

5   "hypothetical" and when the delay "would largely arise from [the

6   fugitive's] own strategic decisions."  <u>Carr</u>, 2020 WL 4816052, at *7.

7        Such are MOURID's claims.  Indeed, a mere general intent to

8   investigate and contest extradition is not unusual or sufficient to

9   warrant bail.  <u>See</u>, <u>e.g.</u>, <u>Smyth</u>, 976 F.2d at 1535-36; <u>Matter of</u>

10  <u>Extradition of Martinelli Berrocal</u>, 263 F. Supp. 3d 1280, 1298 (S.D.

11  Fla. 2017) ("[W]e do not find here that the length of the anticipated

12  extradition process [of a former President of Panama], real or

13  imagined, warrants a finding of special circumstances sufficient to

14  grant bail contrary to the presumption of detention."); <u>In re</u>

15  <u>Extradition of Tehrani</u>, No. SA 16-MJ-250-RAO, 2016 WL 3456971, at *2

16  (C.D. Cal. June 17, 2016) ("The Ninth Circuit has stated that issues

17  common to all incarcerated defendants do not qualify as 'special

18  circumstances.'  Regarding anticipated delay, [the fugitive] has not

19  shown circumstances that are different from 'factors applicable to

20  all defendants facing extradition.'") (citations omitted).

21       Further, to the extent MOURID's intends to independently

22  investigate the German case, including waiting for full discovery

23  from the German prosecutor and then translation of German documents

24  into English, the United States would strongly oppose such efforts to

25  delay extradition proceedings for this purpose, as it would turn this

26  extradition proceeding into a mini-trial on the merits of Germany's

27  criminal charges.  That would be well beyond the scope of an

28  extradition proceeding.  <u>E.g.</u>, <u>Mainero v. Gregg</u>, 164 F.3d 1199, 1207

                                    14

(9th Cir. 1999) ("An extradition proceeding is not a trial. Indeed, the very purpose of extradition treaties is to obviate the necessity of confronting the accused with the witnesses against him."). Indeed, any evidence that such an investigation would generate likely would be inadmissible at his extradition hearing to the extent it contradicts the evidence offered by Germany.  See, e.g., Rana v. Jenkins, 113 F.4th 1058, 1071 (9th Cir. 2024) ("An accused in an extradition hearing has no right to pose questions of credibility as in an ordinary trial.  The only evidence an accused can introduce is evidence that explains away or completely obliterates probable cause. Attacks on credibility, while perhaps compelling to a jury, do not rise to the level of complete obliteration required to find a lack of probable cause.") (cleaned up; quotations and citations omitted); Barapind v. Enomoto, 400 F.3d 744, 749 (9th Cir. 2005) (en banc) ("[E]xtradition courts do not weigh conflicting evidence in making their probable cause determinations.") (internal quotation marks and citation omitted); In re Extradition of Azizi, No. 5:14-xr-90282, 2015 WL 1299791, at *3 (N.D. Cal. Mar. 20, 2015) ("Evidence that does not accept the requesting country's evidence as true [is] considered 'contradictory,' and not 'explanatory,' evidence.").  Thus, MOURID should not be permitted to complain about the length of his extradition proceedings if, as he seemingly admits, he intends to inappropriately prolong these proceedings by seeking to obtain and present inadmissible evidence.  The Court should therefore conclude that his proceedings will not be uniquely protracted so as to constitute a "special circumstance" that warrants his release from custody.

              *b.    The Status of Other Fugitives Is Not a "Special
Circumstance"*

Special circumstances must be "extraordinary" and not factors
applicable to all fugitives facing extradition. <u>Smyth</u>, 976 F.2d at
1535-36; <u>see</u> <u>In re Extradition of Santos</u>, 473 F. Supp. 2d 1030, 1036
(C.D. Cal. 2006) ("The term 'special circumstances,' however, 'has
never been precisely defined and courts have addressed on a case by
case basis particularly sufficient circumstances that would reverse
the strong presumption against bail.'") (quoting <u>Mainero</u>, 950 F.
Supp. 290, 294 (S.D. Cal. 1996)).  Because "special circumstances"
must be specific to the individual seeking bail, a Court must
evaluate the "special circumstances" requirement on a case-by-case
basis.  Thus, despite MOURID's attempt to convince the Court
otherwise (Docket No. 42 at 2 n.2), it is of no consequence that some
of MOURID's co-defendants have been released from custody.

Because each individual's arguments and circumstances are
unique, MOURID cannot overcome the presumption of detention by simply
insinuating that Magistrate Judge Audero's decision was "unfair" when
compared to his co-defendants.  Rather, as set forth herein,
Magistrate Judge Audero correctly concluded that MOURID failed to
establish "special circumstances" warranting release from custody
pending the outcome of his extradition proceedings.

              *c.    Family Hardships are not "Special Circumstances"*

MOURID asserts that he should be released on bail because his
family members, including his wife, daughter, and mother, are
struggling without his assistance while he remains detained.  (Docket
No. 42 at 18-20.)  While the United States is sympathetic, the fact
remains that family members experience "hardship" in almost every

16

case where one person is detained.  As one court noted,

> [T]hat possibility [of unwelcome financial strain], however unfortunate, is present in almost every case where a defendant with family faces detention pending adjudication.  Accordingly, the fact that the defendant's family depends on him for financial and emotional support is not a special circumstance weighing in favor of release.

In re Extradition of Drumm, 150 F. Supp. 3d 92, 99 (D. Mass. 2015); see Antonowicz, 244 F. Supp. 3d at 1072 ("The Court does not intend to understate the financial and emotional burdens that detention causes, but those burdens are present in almost all cases and therefore do not constitute a 'special circumstance.'") (internal quotation and citation omitted); In re Extradition of Beresford-Redman, 753 F. Supp. 2d 1078, 1087 (C.D. Cal. 2010) ("Emotional hardship for the family of a fugitive facing extradition is present in almost all cases and therefore does not constitute a 'special circumstance.'") (internal quotation and citation omitted); In re Extradition of Mahabir, 858 F. Supp. 504, 508 (D. Md. 1994) ("A defendant's incarceration regularly creates difficulties for him and his family."); see also Smyth, 976 F.2d at 1535-36 (special circumstances must be "extraordinary" and not factors applicable to all fugitives facing extradition); In re Extradition of Schumann, No. 18 CR 283, 2018 WL 4777562, at *6 (N.D. Ill. Oct. 3, 2018) ("The inability to have any contact or to provide support for family members are typical circumstances whenever one is taken into custody and cannot be considered 'special circumstances.'").  And indeed, courts have denied bail in

17

1  circumstances similar or arguably more severe than those MOURID

2  describes. <u>See</u> <u>Budrys</u>, 2019 WL 1958566, at *6 (denying bail

3  despite facts that fugitive was the primary caretaker of his

4  three young children while his wife pursued her education, that

5  his charges were non-violent and of a financial nature, that

6  there was some delay in the extradition proceedings, and that

7  fugitive claimed he had a strong possibility of success on the

8  merits).

9      MOURID primarily asserts that his family has been suffering

10  and will continue to suffer hardships if he remains detained

11  because of the role he plays in their lives.  For example,

12  although MOURID's mother purportedly has some health conditions,

13  she lives alone, suggesting that she has a degree of

14  independence and can care for herself.  While it is admirable

15  that MOURID took her to doctor's appointments and helped her

16  with her medicines, MOURID offers nothing to suggest that

17  others, including a hired caregiver, cannot assist his mother.

18  The United State acknowledges the financial and emotional

19  burdens MOURID's wife and daughter are experiencing as a result

20  of his detention, he does not describe circumstances that are

21  any different from other detained individuals with families who

22  care about and rely upon them.

23      Accordingly, any hardship suffered because of MOURID's detention

24  during this extradition proceeding cannot justify his release.

25

26

27

28

4.   <u>MOURID Continues to be a Flight Risk</u>[6]

The lack of "special circumstances" is a sufficient basis upon which the Court could deny MOURID's request to reverse the magistrate judge's detention order.  However, even if the Court were to find "special circumstances" in this case, bail is still unwarranted because MOURID poses an unacceptable flight risk that cannot be negated by bail conditions.

While the United States recognizes that MOURID has significant family ties in the Los Angeles area, he remains a flight risk because he is now aware that he is the subject of prosecution in Germany and if convicted, will serve time in a foreign prison away from his family.  MOURID does not contest this assertion in his pleading.[7] (Docket No. 42 at 20-22.)

He also does not claim that he lacks the financial means to flee with or without his family.  (<u>See</u> <u>id.</u>)  Indeed, as detailed in the Pretrial Services Report, MOURID is dual citizen of Egypt and the United States.  (<u>See</u> PTSR at 3.)  He has significant resources to fund his flight, including a house, a rental property, three automobiles, a monthly income, two bank accounts, and significant

---

[6] The United States does not seek detention on the basis that MOURID is a danger to the community.

[7] As evidenced by a recent case in this district, family obligations do not guarantee that an individual on bond will not flee.  <u>See</u> <u>Former San Fernando Valley Couple Extradited to the United States from Montenegro to Begin Prison Sentences for $20 Million Fraud Scheme</u>, U.S. Attorney's Office (Nov. 18, 2022), <u>https://www.justice.gov/usao-cdca/pr/former-san-fernando-valley-couple-extradited-united-states-montenegro-begin-prison</u> (defendants convicted of COVID fraud and released on bond, cut location monitoring bracelets, abandoned teenage children, and fled to Montenegro); Faith Karimi, <u>A California couple vanished after stealing millions in Covid-19 relief funds. They left a goodbye note for their three kids</u>, CNN (Nov. 18, 2021), <u>https://www.cnn.com/2021/11/18/us/covid-relief-fraud-scheme-cec</u> (same).

investments.  (See id.)  He is an experienced international traveler, who, according to the Pretrial Services Report, "frequently travels overseas. . . . [H]e has traveled to over 20 countries throughout Europe, Asia, and Central America – all for vacation."  (Id.)  While he currently only has a United States passport, there is nothing the Court of United States could do to stop him from getting and ultimately traveling on an Egyptian passport.

While MOURID may have been a target in a related 2020 prosecutions of two co-defendants in New York, it is unpersuasive that MOURID did not flee after learning that fact.  For instance, he may have decided that fleeing would invite additional legal trouble. Moreover, he must have realized he was no longer a target of the U.S. Attorney's Office after those individuals were arrested.  Therefore, at some point, he no longer had an incentive to flee the United States.  Now, however, MOURID has been charged in Germany and is in a different posture, facing the prospect of extradition to, prosecution in, and detention in Germany.  Further, if MOURID were to flee to Egypt, Germany would have difficulty extraditing him from that nation would be difficult because there is no bilateral extradition treaty between Germany and Egypt.

Together, these facts demonstrate that MOURID has the means and wherewithal to flee, despite his family ties and obligations in the United States.

**III. CONCLUSION**

For the foregoing reasons, the United States respectfully requests that this Court uphold Magistrate Judge Audero's decision to deny MOURID's request for bail and continue to detain him for the duration of his extradition proceedings.  If, however, the Court

20

decides that MOURID's release on bond is appropriate, the
United States respectfully requests the opportunity to advocate for
the amount of the bond and conditions of release.


 Dated: March 9, 2026                Respectfully submitted,

                                     TODD BLANCHE
                                     Deputy Attorney General

                                     BILAL A. ESSAYLI
                                     First Assistant U.S. Attorney

                                     IAN V. YANNIELLO
                                     Assistant United States Attorney
                                     Chief, National Security Division


                                     */s/ John J. Lulejian*
                                     JOHN J. LULEJIAN
                                     Assistant United States Attorney

                                     Attorney for Plaintiff
                                     UNITED STATES OF AMERICA

21

## CERTIFICATE OF COMPLIANCE

The undersigned counsel of record for United States of America certifies that this brief contains 5,484 words, which complies with the word limit of L.R. 11-6.1.


Dated: March 9, 2026                    /s/ John J. Lulejian
                                        JOHN J. LULEJIAN
                                        Assistant United States Attorney

1

**DECLARATION OF JOHN J. LULEJIAN**

2      I, John J. Lulejian, declare as follows:

3      1.    I am an Assistant United States Attorney and have been

4   assigned to represent the United States in <u>United States v. Medhat</u>

5   <u>Mourid</u>, Case No. 2:26-cv-02074-SB-MAA.  I make this declaration in

6   support of the United States' Opposition to Relator's Motion to

7   Revoke Magistrate Judge's Detention Order.

8      2.    Attached hereto as Exhibit A is a true and correct copy of

9   the March 5, 2026, e-mail from Relator's counsel to a member of MDC-

10  LA's medical staff, which includes some of Relator's medical records.

11  This declaration, which is not filed <u>under seal</u>, does not include the

12  e-mail attachment because it contains confidential medical

13  information.

14     I declare under penalty of perjury that the foregoing is true

15  and correct to the best of my knowledge.

16     Executed this <u>9th</u> day of March 2026, at Los Angeles, California.

17

18                    */s/ John J. Lulejian*
                     JOHN J. LULEJIAN

19

20

21

22

23

24

25

26

27

28